# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| Plaintiff, | § | |
| | § | |
| and | § | |
| | § | |
| STATE OF TEXAS, | § | |
| Plaintiff-Intervenor, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-07-3795 |
| | § | |
| HALLIBURTON ENERGY | § | |
| SERVICES, INC., *et al.*, | § | |
| Defendants. | § | |
| | § | |

## MEMORANDUM AND ORDER

This case arises from the U.S. Environmental Protection Agency's ("EPA") cleanup (*i.e.*, "removal") of radioactive contamination at three sites in Texas. Pursuant to Section 107(a) of CERCLA,[1] Plaintiff United States of America ("United States") filed this action against nine defendants to recover its response costs for the removal efforts.  Plaintiff State of Texas[2] ("Texas" or "the State") intervened, rasing identical CERCLA claims and also asserting a claim for cost recovery under the Texas

---

[1]    Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9607(a).

[2]    The State of Texas contributed funds to the EPA for the cleanup through its agency, the Texas Commission on Environmental Quality ("TCEQ").

Solid Waste Disposal Act ("TSWDA").[3]   Pending before the Court are several motions.

Defendant QSA Global, Inc. ("QSA Global") filed a Motion for Summary Judgment [Doc. # 129] against the United States and Texas on the grounds that both Plaintiffs' claims are time-barred under applicable federal or Texas law.[4]   The United States and Texas (collectively, "Plaintiffs") cross-moved for summary judgment against QSA Global on the same issue.[5]   Defendant NL Industries, Inc. ("NL") filed a Motion for Partial Summary Judgment [Doc. # 168] against both Plaintiffs on the

---

[3]   TEX. HEALTH & SAFETY CODE § 361.197.

[4]   QSA Global supplemented its Motion with a Memorandum of Law [Doc. # 129-2] ("QSA Global's Mem.").

[5]   The United States' Cross-Motion is Doc. # 149, and Texas' is Doc. # 152.   The United States filed a Memorandum of Law in Support of United States' Opposition to Defendant QSA Global's Motion for Summary Judgment on the Statute of Limitations and Cross-Motion for Summary Judgment ("U.S. Opp'n to QSA Global") [Doc. # 148], *see also* [Doc. # 149-2].   Texas filed a Response in Opposition to QSA Global, Inc.'s Motion for Summary Judgment, and in Support of Cross-Motion for Summary Judgment ("Texas Opp'n to QSA Global") [Doc. # 151].   QSA Global filed a Reply in Further Support of Defendant QSA Global, Inc.'s Motion for Summary Judgment and in Opposition to the United States Cross-Motion for Summary Judgment ("QSA Global's Reply to U.S.") [Doc. # 165-2],   and a Reply Memorandum of Law in Further Support of Defendant QSA Global Inc.'s Motion for Summary Judgment and in Opposition to the State of Texas' Cross-Motion for Summary Judgment ("QSA Global's Reply to Texas") [Doc. # 166-2].   The United States filed a Reply Memorandum of Law in Support of Plaintiff United States' Cross-Motion for Summary Judgment on Defendant QSA Global, Inc.'s Statute of Limitations Defense ("U.S. Reply to QSA Global") [Doc. #174].   Finally, Texas filed a Reply to QSA Global, Inc.'s Opposition to Cross-Motion for Summary Judgment ("Texas Reply to QSA Global") [Doc. # 172].

grounds that their claims are time-barred.[6]  The motions have been fully briefed and are ripe for decision.

Upon review of the parties' submissions, all pertinent matters of record, and applicable law, the Court concludes that QSA Global's Motion for Summary Judgment should be **granted in part** and **denied in part;** United States' Motion for Summary Judgment should be **denied**; Texas' Motion for Summary Judgment should be **granted in part** and **denied in part;** and the NL Motion for Summary Judgment should be **granted in part and denied in part.**

## I.    FACTUAL BACKGROUND[7]

In this action, Plaintiffs United States and the State of Texas seek to recover response costs for removal actions at three sites contaminated with radioactive materials.  Beginning in 1971, the GNI Group, Inc. ("GNI"), owned and operated a facility in Webster, Texas, that manufactured, stored, reworked, and/or repaired items containing radioactive materials for customers.   In the course of operations, radioactive material would sometimes be transferred to sites in Odessa, Texas, and Houston, Texas, for processing and/or storage.[8]  It was later discovered that the Webster, Odessa, and Houston sites (collectively, the "Gulf Nuclear Sites"), including

---

[6]    NL supplemented its Motion with a Memorandum in Support ("NL Mem.") [Doc. #168-2]. The United States responded [Doc. # 189] ("U.S. Resp. to NL"), as did Texas ("Texas Resp. to NL") [Doc. # 186].  NL replied to both Plaintiffs ("NL Reply") [Doc. # 198].

[7]    The background facts are summarized briefly here.  For additional details see this Court's Memorandum and Order entered on March 6, 2008 [Doc. # 78].

[8]    In 2000, GNI filed for bankruptcy and the Webster and Houston sites were sold by the Bankruptcy Trustee.

the buildings, equipment, soil, and septic systems, were contaminated with radioactive materials.

In 2001 and 2002, the EPA commenced removal actions at each of the three sites, with the assistance of the State of Texas, acting through its agency, the Texas Commission on Environmental Quality ("TCEQ").  It is undisputed that removal actions were completed for the Webster and Houston sites in February, 2004.  The completion date for the Odessa site is in dispute, but occurred no later than October, 2001.  CERCLA § 113(g)(2)(A) provides that an initial action to recover costs for removal "must be commenced . . . within 3 years of completion." 42 U.S.C. § 9613(g)(2)(A).  The parties disagree as to what, if any, limitations period applies to the TSWDA claim.

The United States filed the instant CERCLA complaint against Defendants on November 9, 2007.  Texas filed its complaint-in-intervention, asserting both CERCLA and TSWDA claims, on November 19, 2007.

## II.    SUMMARY JUDGMENT STANDARD

Rule 56 of the Federal Rules of Civil Procedure mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing of the existence of an element essential to the party's case, and on which that party will bear the burden at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc); *see also Baton Rouge Oil and Chem. Workers Union v. ExxonMobil Corp.,* 289 F.3d 373, 375 (5th Cir. 2002).  Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  FED. R. CIV. P.  56(c); *Celotex*

*Corp.*, 477 U.S. at 322–23; *Weaver v. CCA Indus., Inc.*, 529 F.3d 335, 339 (5th Cir. 2008).

For summary judgment, the initial burden falls on the movant to identify areas essential to the non-movant's claim in which there is an "absence of a genuine issue of material fact." *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005). The moving party, however, need not negate the elements of the non-movant's case. *See Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005). The moving party may meet its burden by pointing out "'the absence of evidence supporting the nonmoving party's case.'" *Duffy v. Leading Edge Products, Inc.*, 44 F.3d 308, 312 (5th Cir. 1995) (quoting *Skotak v. Tenneco Resins, Inc.,* 953 F.2d 909, 913 (5th Cir. 1992)).

If the moving party meets its initial burden, the non-movant must go beyond the pleadings and designate specific facts showing that there is a genuine issue of material fact for trial. *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 282 (5th Cir. 2001) (internal citation omitted). "An issue is material if its resolution could affect the outcome of the action. A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *DIRECT TV Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2006) (internal citations omitted).

In deciding whether a genuine and material fact issue has been created, the facts and inferences to be drawn from them must be reviewed in the light most favorable to the nonmoving party. *Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co.*, 336 F.3d 410, 412 (5th Cir. 2003). However, factual controversies are resolved in favor of the non-movant "only 'when both parties have submitted evidence of contradictory facts.'" *Alexander v. Eeds*, 392 F.3d 138, 142 (5th Cir. 2004) (quoting *Olabisiomotosho v. City of Houston,* 185 F.3d 521, 525 (5th Cir. 1999)). The non-

movant's burden is not met by mere reliance on the allegations or denials in the non-movant's pleadings.  *See Diamond Offshore Co. v. A&B Builders, Inc.*, 302 F.3d 531, 545 n.13 (5th Cir. 2002).  Likewise, "conclusory allegations" or "unsubstantiated assertions" do not meet the non-movant's burden.  *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 399 (5th Cir. 2008).  Instead, the nonmoving party must present specific facts which show "the existence of a genuine issue concerning every essential component of its case."  *Am. Eagle Airlines, Inc. v. Air Line Pilots Ass'n, Int'l*, 343 F.3d 401, 405 (5th Cir. 2003) (citation and internal quotation marks omitted).  In the absence of any proof, the court will not assume that the non-movant could or would prove the necessary facts.  *Little*, 37 F.3d at 1075 (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

In evaluating the propriety of a defendant's motion for summary judgment based upon the statute of limitations, the court must draw all reasonable inferences in favor of the non-moving party.  *Martin v. Alamo Community College Dist.*, 353 F.3d 409, 412 (5th Cir. 2003) (citing *Chaplin v. NationsCredit Corp.,* 307 F.3d 368, 372 (5th Cir.2002)); *Daniels v. City of Arlington, Tex.,* 246 F.3d 500, 502 (5th Cir.2001)).  "To obtain summary judgment, 'if the movant bears the burden of proof on an issue . . . because . . . as a defendant he is asserting an affirmative defense, he must establish beyond peradventure *all* of the essential elements of the . . .defense to warrant judgment in his favor.'"  *Chaplin,* 307 F.3d at 372 (quoting *Fontenot v. Upjohn Co.,* 780 F.2d 1190, 1194 (5th Cir.1986)) (emphasis supplied).

Finally, when evaluating cross-motions for summary judgment, the "[c]ross-motions must be considered separately, as each movant bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law."  *Shaw Constructors v. ICF Kaiser Eng'rs, Inc*., 395 F.3d

533, 538-39 (5th Cir. 2004) (citing 10A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2720 (3d ed. 1998) ("WRIGHT")).  "But if there is no genuine issue and one or the other party is entitled to prevail as a matter of law, the court will render judgment."  WRIGHT, § 2720.

## III.   ANALYSIS

### A.   QSA Global

#### 1.   Plaintiffs' CERCLA Claims Against QSA Global

QSA Global moves for summary judgment on the grounds that Plaintiffs' CERCLA claims are barred by the applicable statute of limitations.  CERCLA § 113(g)(2)(A) provides that an initial action to recover costs for removal "must be commenced . . . within 3 years of completion."  42 U.S.C. § 9613(g)(2)(A).  As noted, the EPA's removal actions for the Webster and Houston sites were completed in February, 2004.  Plaintiffs' claims were not filed until November, 2007–more than three years after completion and outside of the limitations period.  Plaintiffs concede that they did not file their complaints within three years after completion of the removal actions.[9]  They argue that they are entitled to equitable tolling of the limitations period, and have cross-moved for summary judgment on that basis.

Plaintiffs allege that QSA Global may be held liable under CERCLA as a successor or assignee of Amersham Corporation,[10] an entity identified by the EPA as

---

[9]     *See* U.S. Opp'n to QSA Global, at 23 n.40 ("The United States is not arguing here that it filed its Complaint within three years after the completion of the removal action at the GNI sites.").  Texas Opp'n to QSA Global, at 3-4 (arguing that the State occupies the same legal ground as the United States).

[10]    Amersham Corporation, a Delaware Corporation, was renamed Amersham Life Science, Inc. in 1994.  Subsequent to a merger, this entity was renamed Amersham Pharmacia Biotech, Inc. in 1997.  It's name was changed again to Amersham Biosciences Corp. in 2001.  *See* Delaware Secretary of State Records Provided as Attachments to October 5, 2007 Letter, Exh. 10 [Doc. # 148-13], at 9 of 40.  These
(continued...)

a potentially responsible party ("PRP") for the Webster and Houston sites.  Plaintiffs charge that Amersham arranged for the disposal of hazardous substances at these sites, and acquired hazardous substances from GNI which were released or disposed of at the sites.  In 1994, Amersham assigned all assets and liabilities of its quality, safety, and assurance business, including the GNI-related business, to QSA Newco, a newly created, wholly-owned subsidiary.  In 1998, Amersham sold this quality, safety and assurance business (which was then Amersham Corporation)[11] to AEA Technology PLC, which changed the name to AEA Technology QSA, Inc. ("AEA Technology QSA").  AEA Technology QSA, in turn, was purchased by another entity in 2005, and subsequently renamed QSA Global.  Accordingly, Plaintiffs allege, QSA Global is liable as a successor to AEA Technology QSA, a successor or assignee of Amersham's GNI-related assets and liabilities.[12]  This corporate history is not in dispute.

The crux of Plaintiffs' claim for equitable tolling is that they did not timely file suit against QSA Global because Amersham, and later its successor, the GE-related

---

[10]     (...continued)
entities were all subsidiaries of Amersham PLC.  *See* 2003 Information Request Response, Deposition of Lisa Lowe [Doc. # 148-5], at 8 of 47.   For the sake of clarity, and because Plaintiff the United States does so, the Court refers to these entities, including Amersham PLC, collectively, as "Amersham."

[11]     This was a "new" Amersham Corporation, distinct from, though—prior to 1998— affiliated with, the Amersham Corporation that transacted with GNI.  *See* Amersham Corporate History Flowchart, Exh. 5 to Deposition of Vito Pulito as Rule 30(b)(6) Witness for GE Defendants [Doc. # 148-10], at 35 of 35.  The original Amersham Corporation had become Amersham Pharmacia Biotech by 1998.  *See supra* note 10.

[12]     *See* Amersham Corporate History Flowchart, Exh. 5 to Deposition of Vito Pulito as Rule 30(b)(6) Witness for GE Defendants [Doc. # 148-10], at 35 of 35; 1994 Bill of Sale and Assignment and Assumption of Liabilities, Exh. 4 [Doc. # 148-7], at 36-37 of 49; Excerpts from QSA Global's Response to First Set of Interrogatories, Exh. 8 [Doc. # 148-12], at 31-32 of 49, ¶ 16; *see also* U.S. Opp'n to NL, at 8-11.

Defendants ("GE Entities"),[13] misled the United States and thus prevented it from identifying QSA Global as a PRP until after the limitations period had expired.[14] The relevant facts are set forth as follows.

After cleaning up the Gulf Nuclear Sites, the EPA sought to determine which entities were responsible for the contamination and to recover its response costs. Pursuant to CERCLA § 104(e), in 2003, the EPA sent a complex Notice and Information Request to numerous PRPs, including Amersham.   The letter accompanying the Information Request stated that Amersham should include in its response "information about other parties who may have information which may assist the EPA in its investigation of the Site or may be responsible for the contamination . . . ."[15] The Information Request provided detailed instructions and defined numerous terms.  The instructions required Amersham to identify any persons who might have information or documents responsive to the Request, and to identify each document

---

[13]     Amersham Biosciences Corp. (a successor of the original Amersham Corporation) was renamed GE Healthcare Bio Sciences Corp. in 2006 following GE's acquisition of Amersham PLC in 2004.  *See* Delaware Secretary of State Records Provided as Attachments to October 5, 2007 Letter, Exh. 10 [Doc. # 148-13], at 9, 21 of 40; Amersham Corporate History Flowchart, Exh. 5 to Deposition of Vito Pulito as Rule 30(b)(6) Witness for GE Defendants [Doc. # 148-10], at 35 of 35.  GE Healthcare Bio-Sciences Corp. is one of several GE defendants named by the United States in its complaint as alleged successors to Amersham's liability.

[14]     Texas argues that because it entered into an agreement with the EPA to share response costs for  the Gulf Nuclear Sites cleanup, it occupies a similar legal and equitable position as the United States.  *See* Texas Opp'n to QSA Global, at 3-5.  Thus it incorporates the United States' arguments for equitable tolling.  *Id.*  The discussion here focuses on the activities of the United States because it was the party investigating the Gulf Nuclear Sites.

[15]     2003 Notice and Information Request, Exh. 2 to Deposition of Lisa Lowe [Doc. # 148-4], at 12 of 40.

consulted, examined or referred to in preparing its response.[16]  The terms "you" and "Respondent" were defined as the addressee including successors and assigns.[17]  The Information Request posed six particular questions, including: "Identify the parent corporation and all subsidiaries of the Respondent."[18]  The Notice and Information Request indicated that compliance was mandatory under federal law and that false, fictitious, or fraudulent statements could lead to civil or criminal penalties.[19]

Amersham, which responded on behalf of  "Amersham plc and its affiliates," did not identify AEA Technology PLC, AEA Technology QSA, or QSA Newco in its response to this 2003 EPA inquiry.  It did not disclose the 1994 assignment of its quality, safety, and assurance business to QSA Newco, or the 1998 sale of this business to AEA Technology PLC.  Moreover, the United States asserts that Amersham did not disclose documents and correspondence that the United States alleges were responsive to the Information Request and would have identified AEA Technology QSA as a PRP.[20]  As described above, however, the corporate predecessor of QSA Global in existence at the time of the 2003 Information Request was AEA

---

[16]  *Id.*, Exh. 4, at 32 of 40, ¶¶ 4,6.

[17]  *Id.* at 34 of 40, ¶ 12.

[18]  *Id.* at 36 of 40, ¶ 1.

[19]  *Id.* at 31 of 40.

[20]  The United States has produced evidence that in 2003 Amersham employees were in possession of correspondence received from AEA Technology PLC employees regarding radioactive materials purchased by Amersham from GNI.  This correspondence included emails, spreadsheets and photographs forwarded from AEA Technology PLC employees to Amersham employees in August and September, 2003.  *See* Email, Spreadsheets and Photographs from AEA Technology PLC, Exhs. 6-13 to Deposition of Lisa Lowe [Doc. # 148-7], at 10-34 of 49; *see also* U.S. Opp'n to QSA Global, at 11-14.

Technology QSA, a subsidiary of AEA Technology PLC, not an Amersham affiliate.

The EPA sent a second Information Request to Amersham in July 2007, approximately five months after the limitations period had expred. The response indicated that, following a merger and various name changes, the entity formerly known as Amersham was then known as GE Healthcare Bio Sciences Corp. It was not until the GE Entities filed an amended response to the 2007 Information Request on November 5, 2007, however, (four days before the United States filed its Complaint in this case) that they identified QSA Newco and AEA Technology QSA, or the transactions that created these entities, and their successors, which may be PRPs for the Gulf Nuclear Sites.

Plaintiffs argue that because Amersham, which later became the GE Entities, agreed to indemnify AEA Technology and its successors with respect to any liability related to the GNI sites as part of the 1998 sales agreement, Amersham had an incentive to mislead the United States about QSA Global's existence and status as a PRP.[21] Plaintiffs contend that it was the acts and omissions of Amersham and the GE Entities that prevented the timely filing of the present cost-recovery actions, and the statute of limitations should therefore be equitably tolled to allow Plaintiffs to pursue their CERCLA claims against QSA Global on the merits.

---

[21] Plaintiffs also assert that because of this indemnity agreement, there would be little prejudice if equitable tolling was granted as QSA Global is indemnified with respect to GNI-related liability. *Id.* at 30; U.S. Reply to QSA Global, at 11-12. QSA Global, first and foremost, disputes that it is an indemnified party under the 1998 agreement. QSA Global Reply to U.S., at 11-12. The Court does not reach this issue, however. Regardless whether QSA Global is an indemnified party, the United States has not alleged that QSA Global itself misled the EPA in any way during the relevant time period. *See* discussion in text *infra* at pages 9-11. Further, entitlement to equitable tolling does not require a showing of the absence of prejudice.

Equitable tolling is an extraordinary remedy that, if available, is only sparingly applied. *See Irwin v. Dep't of Vet. Affairs*, 498 U.S. 89, 96 (1990). "[A] litigant seeking equitable tolling bears the burden of establishing two elements: (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way." *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005). The Fifth Circuit has opined that equitable tolling may be granted at the district court's discretion only "in rare and exceptional circumstances." *Davis v. Johnson*, 158 F.3d 806, 811 (5th Cir. 1998); *Coleman v. Johnson*, 184 F.3d 398, 402 (5th Cir. 1999). In that respect, the Fifth Circuit has limited the doctrine to apply "principally where the plaintiff is actively misled by the defendant about the cause of action or is prevented in some extraordinary way from asserting his rights." *Melancon v. Kaylo*, 259 F.3d 401, 407 (5th Cir. 2001) (quoting *Rashidi v. American President Lines*, 96 F.3d 124, 128 (5th Cir. 1996)). A plaintiff must pursue its rights diligently; a "'garden variety claim of excusable neglect'" does not support equitable tolling. *Coleman*, 184 F.3d at 402 (quoting *Rashidi*, 96 F.3d at 128).

Assuming for present purposes the truth of Plaintiffs' allegations of misconduct by Amersham and/or the GE Entities, Plaintiffs nevertheless are not entitled to equitable tolling against QSA Global. Significantly, Plaintiffs do not make, and the record does not support, any accusation that QSA Global itself, or its predecessors, misled the EPA. Amersham sold its quality, safety, and assurance business to AEA Technology, PLC in 1998—well before the EPA sent the 2003 Notice and Request for Information to Amersham. Plaintiffs do not deny that AEA Technology and its successors, including QSA Global, were separate entities from, and unaffiliated with Amersham or the GE Entities during the relevant 2003 to 2007 period. Instead, Plaintiffs ask the Court to toll the limitations period against one defendant (QSA Global) based on the alleged acts and omissions of others (Amersham and its

successor, the GE Entities).  The Court declines the invitation.  *Cf. United States v. Custom Leather Services, Inc.*, No. 91-3338, 1993 U.S. Dist. Lexis 16269, *3 (E.D. Pa. April 14, 1993) (holding that a CERCLA defendant was estopped from pleading the statute of limitations when *its own* non-compliance with § 104(e) information requests made it impossible for the Government to assert a timely claim against *the same* defendant).

Plaintiffs contend that the EPA was lulled into believing it had identified the correct Amersham parties and was prevented from timely identifying QSA Global by Amersham's and the GE Entities' misrepresentations in their responses to the Notice and Information Requests, combined with Amersham's continued presence at PRP meetings, and the absence of any denial by Amersham and later the GE Entities that they were a responsible party.[22]  Aside from the basic fact that it was not QSA Global that engaged in alleged wrongdoing, Plaintiffs have not shown that Amersham and the GE Entities' failure to identify QSA Global or its predecessors was a rare or extraordinary circumstance that prevented the EPA from asserting its rights.  Although Amersham and the GE Entities may have engaged in misconduct or erred in their responses to the 2003 and 2007 EPA Notice and Information Requests in not complying with all the detailed instructions and definitions, some of the omissions were apparent from the face of the 2003 response in that Amersham obviously had not supplied any corporate history.  The EPA evidenced some lack of diligence.  The EPA failed to pose a specific question seeking Amersham's corporate history until July 2007, several months after the limitations period expired.  Nor did the EPA do comprehensive and timely searches of pertinent databases.[23]

---

[22]   *See, e.g.*, U.S. Reply to QSA Global, at 9-10.

[23]   There is no indication in the record that the United States endeavored to search
(continued...)

QSA Global bolsters its position further through a letter from a group of PRPs sent to the EPA in 2004 identifying many individuals who were described as potentially having information regarding the Gulf Nuclear Sites.  Several of these individuals were listed as "Amersham employees."  It is undisputed that, one of them, Hugh Evans, actually worked for AEA Technology QSA, QSA Global's immediate predecessor, at the time.  Had the EPA timely followed up on these leads, it likely would have uncovered QSA Global as a PRP.

Under all these circumstances, the EPA's failure to identify QSA Global's existence in a timely manner amounts to excusable neglect.  Viewed in their totality, the facts presented do not amount to rare and extraordinary circumstances that prevented Plaintiffs from asserting their rights in a timely manner against QSA Global.  Accordingly, the United States has not shown itself entitled equitable tolling, and Plaintiffs' CERCLA claims against Defendant QSA Global are time-barred under § 113(g)(2)(A).

### 2.  The Texas Solid Waste Disposal Act claim

In addition to its CERCLA claim, Texas also asserts a claim against QSA Global under TSWDA § 361.197(d).[24]  QSA Global moves for summary judgment on

---

[23]        (...continued)
various available databases between 1998 and 2007 (such as the Securities and Exchange Commission data) or publicly available EPA records.  The EPA also had authority at any time to require Amersham to provide more historical corporate information.

[24]        TEX. HEALTH & SAFETY CODE § 361.197(d).

the basis that the State's claim is barred by the doctrine of laches.[25]   Texas cross-moves for summary judgment on the laches issue.

Laches under Texas law rests on two elements:  (1) unreasonable delay or lack of diligence by a party in bringing a claim, and (2) a good-faith change of position by another to his detriment because of the delay.  *Clark v. Amoco Production Co.*, 794 F.2d 967, 971 (5th Cir. 1986) (citing *City of Fort Worth v. Johnson*, 388 S.W.2d 400, 403 (Tex. 1964)).  Equitable defenses like laches and estoppel have been consistently held not to apply against a governmental entity in a case involving governmental functions.  *See City of Hutchins v. Prasifka*, 450 S.W.2d 829, 835 (Tex. 1970); *accord Brazoria County, Tex. v. Hartford Cas. Ins. Co.*, 2005 WL 1364837, at *2 (S.D. Tex. June 7, 2005).  However, Texas courts have recognized an exception to this general rule "where justice requires it and *where no governmental function is impaired*." *Roberts v. Haltom City*, 543 S.W.2d 75, 79 (Tex. 1976) (emphasis supplied); *accord Brazoria Co.,* 2005 WL 1364837, at *2.

---

[25]     In its original motion for summary judgment, QSA Global asserted that the TSWDA claim was barred by a residual four-year statute of limitations period  under Texas law.  *See* QSA Global's Mem., at 11-13 (citing Tex. Civ. Prac. & Rem. Code § 16.051).  Texas responded that the cited provision does not apply to an action brought by the State.  Texas Opp'n to QSA Global, at 6-7 (citing Tex. Civ. Prac. & Rem. Code § 16.051).  QSA Global implicitly concedes the statute of limitations issue in its reply, but, for the first time, raises the doctrine of laches as a defense.  *See* QSA Global Reply, at 1, 1-6 ("With respect to the state statute of limitations argument, the State correctly quotes section 16.061 of the Texas Civil Practice & Remedies Code, which addressed the applicability of the statute of limitations.  No matter how that provision is applied, the State is remains [sic] subject to the doctrine of laches.").  To the extent that QSA Global still presses a limitations argument, that argument is rejected.  The Court holds that the four-year limitations period set forth in Texas Civil Practices & Remedies Code § 16.051 is not applicable to the State's claim under TSWDA, Tex. Health & Safety Code § 361.197(d).  Nor is the one-year limitations period in Texas Health & Safety Code § 361.197(a) applicable to the State's claim.  *See* Part III(B)(2) *infra*.

QSA Global argues that no governmental function would be impaired by dismissal of the State's TSWDA cost-recovery action because this case is merely a claim for money.[26]   The Court disagrees.   The stated purpose of TSWDA is "to safeguard the health, welfare, and physical property of the people and to protect the environment by controlling the management of solid waste, including accounting for hazardous waste that is generated." TEX. HEALTH & SAFETY CODE § 361.002(a).  The statute is construed liberally to give effect to its remedial purpose.  *R.R. Street & Co. Inc. v. Pilgrim Enterprises, Inc.*, 166 S.W.3d 232, 238 (Tex. 2005).  Further, Texas brings its TSWDA cost-recovery action under § 361.197(d), which provides for the recovery of funds expended out of the Hazardous and Solid Waste Remediation Fee Account ("Account"), established under § 361.133.  The Account, in turn, is partially funded by such § 361.197(d) cost-recovery actions.  *See id.*, § 361.133(b)(3).  Money in the Account may only be used for enumerated clean-up activities.  *See id.,* § 361.133(c), (g).  The State's cost-recovery action under § 361.197(d) advances a governmental function that would be impaired by dismissal of the State's claim in this

---

[26]     QSA Global's Reply to Texas, at 2

case.[27]   Accordingly, the State's TSWDA § 361.197(d) cost-recovery action is not subject to QSA Global's defense of laches.

### B.   NL Industries

#### 1.   Plaintiffs' CERCLA Claims Against NL

NL contends that the United States' CERCLA claims against it with regard to the Odessa site are barred under the three-year limitations period set forth in § 113(g)(2)(A).  NL and the United States agree that the Odessa removal action was completed at some point in 2001.  The instant action was not filed until 2007, well more than three years after removal was complete.  The United States responds that NL signed four consecutive agreements that tolled the running of the statute of limitations until after the complaint was filed.  NL moves for summary judgment on three grounds: First, NL contends that § 113(g)(2)(A) sets forth a jurisdictional requirement that cannot be extended by consent, *i.e.*, by a tolling agreement.  Second, NL urges that even if § 113(g)(2)(A)'s timing requirement can be extended by a

---

[27]   The Court notes that, even if QSA Global could surmount the governmental-function hurdle, it would not be entitled to summary judgment because it has failed to establish as a matter of law that it has been prejudiced by the State's alleged delay in bringing its TSWDA claim.  On this point, QSA produces only a scant narrative in its Reply:

> In the meantime, QSA and its predecessors underwent a number of sales and reorganizations, employees moved or retired, memories have faded, and documents have been discarded. It is now more difficult, and potentially impossible, for QSA to find all relevant employees and identify relevant documents. QSA has been prejudiced through the lengthy passage of time.

*See* QSA Global's Reply, at 4.  These conclusory allegations and unsubstantiated assertions are insufficient to establish "beyond peradventure" that QSA Global has made a good-faith change of position to its detriment as is necessary to establish laches. *See Chaplin v. NationsCredit Corp.,* 307 F.3d 368, 372 (5th Cir.2002); *Clark*, 794 F.2d at 971.

tolling agreement, the agreements signed by NL were ineffective because they recite a tolling period that commenced after the limitations period had already expired. Third, NL argues that the tolling agreements are invalid because they were signed after the limitations period expired, and such agreements cannot revive an expired statutory limitations bar because there can be no consideration for such an agreement. The Court addresses each of NL's arguments in turn.

### a.    Jurisdictional Prerequisite Argument

NL contends that all CERCLA claims against it arising from the Odessa Site are barred because Plaintiffs have not met the "statutory condition" of CERCLA § 113(g)(2)(A).[28] Section 113(g)(2)(A) provides in pertinent part:

> An initial action for recovery of the costs referred to in section 9607 of this title must be commenced--
>
> > (A)    for a removal action, within 3 years after completion of the removal action, except that such cost recovery action must be brought within 6 years after a determination to grant a waiver under section 9604(c)(1)(C) of this title for continued response action.

42 U.S.C. § 9613(g)(2)(A).  NL argues that the time requirement in § 113(g)(2)(A) is a jurisdictional prerequisite to suit in federal court that cannot be extended by a tolling agreement between parties.

The Court disagrees.  The Supreme Court teaches that "the law typically treats a [statute of] limitations defense as an affirmative defense . . . subject to rules of forfeiture and waiver." *John R. Sand & Gravel Co. v. U.S.*, __ U.S. __, 128 S.Ct. 750, 753 (2008).  "Such statutes also typically permit courts to toll the limitations period in light of special equitable considerations."  *Id.*; *see, e.g., Zipes v. Transworld*

---

[28]      *See generally* NL Mem., at 6-15; NL Reply, at 2-12.

*Airlines, Inc.*, 455 U.S. 385, 393 (1982) ("We hold that filing a timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling."); *Am. Pipe and Constr. Co. v. Utah*, 414 U.S. 538, 558 (1974) ("In recognizing judicial power to toll statutes of limitation in federal courts we are not breaking new ground."); *In re Dynegy, Inc. Sec. Litig.*, 339 F. Supp. 2d 804, 859 (S.D. Tex. 2004) ("The ability of parties to enter agreements to waive the assertion of defenses based on limitations has long been recognized in [the Fifth] circuit."). NL points to no authority that would take § 113(g)(2)(A)'s limitations period out of the general rule.

An analysis of CERCLA's structure, underlying policy goals, and legislative history, as well the reasoning of relevant precedent, leads to the conclusion that Congress intended § 113(g)(2)(A) to provide a typical statute of limitations subject to extension by tolling agreement. *See Zipes*, 455 U.S. at 393-98 (analyzing these factors in determining that "filing a timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to suit in federal court."). First, CERCLA's structure indicates that the time requirement in § 113(g)(2)(A) is non-jurisdictional. In § 113(b), CERCLA confers on federal district courts jurisdiction over controversies arising under that statute. *See* 42 U.S.C. § 9613(b). The limitations provision appears in a different subsection, namely, § 113(g). *See* 42 U.S.C. § 9613(g)(2)(A). The jurisdictional provision in subsection (b) is not limited to timely-filed cost-recovery actions, and makes no reference to the limitations provision. *See Zipes*, 455 U.S. at 393-94 (noting that Title VII's jurisdiction-conferring provision is distinct from the statute's timely-filing provision and "does not limit jurisdiction to those cases in which there has been a timely filing . . . ."). Likewise, the limitations provision, in subsection (g), contains no reference to the jurisdiction of the district courts nor to

§ 113(b).  *See id.* (explaining that Title VII's timely filing requirement "does not speak in jurisdictional terms or refer in any way to the jurisdiction of the district courts").   In sum, CERCLA's jurisdiction-conferring section and its limitations provisions are located in separate subsections, have distinct language, and do not relate to each other in any way material to the pending issues.  The Court concludes that § 113(g)(2)(A) establishes a procedural limitation, not a jurisdictional condition, on cost-recovery claims.  *See id.* at 393-94, 398.

Construing § 113(g)(2)(A) as a non-jurisdictional statute of limitations subject to tolling based on parties' agreements also is consistent with CERLCA's broad remedial purpose.  *See Uniroyal Chem. Co. v. Deltech Corp.*, 160 F.3d 238, 242 (5th Cir. 1998) ("In light of [CERCLA's broad remedial purpose] we are obligated to construe its provisions liberally in order to avoid frustrating Congress' intent.").  *See OHM Remediation Servs. v. Evans Cooperage Co.*, 116 F.3d 1574, 1578 (5th Cir. 1997) ("CERCLA's broad, remedial purpose is to facilitate the prompt cleanup of hazardous waste sites and to shift the cost of environmental response from the taxpayers to the parties who benefitted from the wastes that caused the harm.").  As the facts of the instant case make plain, contaminated sites can have long and complex histories.  Tolling agreements assist the United States in the time-consuming process of investigating these sites and identifying all PRPs.  The United States argues persuasively that it routinely enters into tolling agreements in order to investigate and facilitate settlements that result in the cleanup of hazardous waste and recovery of costs incurred by government-funded cleanups.  Facilitating settlements is a goal of CERCLA.  *See* 42 U.S.C. § 9622(a).  Construing § 113(g)(2)(A) as a non-jurisdictional statute of limitations subject to consensual tolling is consistent with these CERCLA policy goals.  *Cf. Zipes*, 455 U.S. at 397 (explaining that a "technical reading" of Title VII would be "particularly inappropriate in a statutory scheme in

which laymen, unassisted by trained lawyers, initiate the process."). Such a construction also is consistent with the "well established principle that 'statutes of limitations sought to be applied to bar rights of the Government, must receive a strict construction in favor of the Government.'" *United States v. Retirement Serv. Group*, 302 F.3d 425, 432 (5th Cir. 2002) (quoting *Badaracco v. Comm'r*, 464 U.S. 386, 391 (1984)).

There is nothing in CERCLA's legislative history to suggest a contrary result. Congress' statement of purpose behind the section was to provide "revised statutes of limitations . . . for bringing cost recovery actions under Section 107." *See* 131 CONG. REC. 34646 (1985) (statement of Rep. Glickman), *available* at 1985 WL 722394. NL inaptly relies on an explanation in a compromise Judiciary Committee report,[29] largely incorporated into the final version of the legislation, that the EPA generally should bring cost-recovery actions as soon as possible and that "the government will be required to bring a cost recovery action within three years after completion of the removal action." *Id.* These statements are as consistent with § 113(g)(2)(A) being a statute of limitation as a jurisdictional provision. Indeed, the section in which the legislative explanation appears is entitled: "Statutes of Limitations: New Subsection 113(g) of CERCLA." *Id.*; *see Zipes*, 455 U.S. at 394 (noting Congress' reference to Title VII's time requirement as a "period of limitations" in holding that the provision was not a jurisdictional prerequisite).

NL cites no cases that hold CERCLA § 113(g)(2)(A) is a jurisdictional prerequisite to liability. The United States, on the other hand, supplies several cases finding that tolling agreements may toll or waive the § 113(g)(2)(A) limitations period. *See, e.g.*, *United States v. Findett Corp.*, 220 F.3d 842, 848 (8th Cir. 2000)

---

[29]     *See* NL Mem., at 10-12; NL Reply, at 10.

(finding that even if a cost-recovery action was an "initial" action subject to a six year statute of limitations, it was timely because it was "filed within seven years (six years plus the one-year extension pursuant to the tolling agreement) after the initiation of actual construction."). *See also United States v. Timmons Corp.*, No. 1:03-CV-951, 2006 WL 314457, *12-*13 (N.D. N.Y. Feb. 08, 2006); *United States v. Domenic Lombardi Realty, Inc.*, C.A. No. 98-591, 2001 U.S. Dist. Lexis 24645, *54-*56 (D.R.I. Jan. 25, 2001) (both denying § 113(g)(2) limitations arguments in cost-recovery actions filed more than three years after the completion of removal activities because of agreements that tolled the statute of limitations).

Cases outside of the CERCLA context in which a time requirement was found to be jurisdictional are distinguishable. In *John R. Sand & Gravel*, the Supreme Court distinguished between typical statutes of limitations permitting tolling and waiver and the "special" Court of Federal Claims statute of limitations based on longstanding precedent that the latter was a jurisdictional bar. 128 S.Ct. at 752, 753-56. Similarly, the Court has held the time limit of Federal Rule of Appellate Procedure 4(a) is jurisdictional; this ruling was based on "well over a century" of case law so interpreting that provision. *Bowles v Russel*, 551 U.S. 205, 209-210 & 210 n.2. Unlike the limitations requirements in these cases, there is no longstanding precedent that CERCLA § 113(g)(2) is jurisdictional. Indeed, NL points to no precedent at all.

Further, the Fifth Circuit has rejected arguments that all statutory time limits are jurisdictional requirements. In *United States v. Petty*, the Fifth Circuit read *Bowles* as limited to "jurisdictional requirements,"and thus held that the Antiterrorism and Effective Death Penalty Act's ("AEDPA") one-year limitation period was subject to extension by equitable tolling. 530 F.3d 361, 364 & n.5 (5th Cir. 2008). *See also Boothe v. Quarterman,* 2008 WL 1771919, at *15-*16 (S.D. Tex. Apr. 15, 2008) (analyzing *Bowles* and *John R. Sand & Gravel* and noting that most statutes of

limitations are non-jurisdictional).[30]   Other circuits agree that *Bowles* did not transform every statutory time limit into a jurisdictional requirement.   *See Waldron-Ramsey v. Pacholke*, 556 F.3d 1008, 1011 n.2 (9th Cir. 2009); *Diaz v. Kelly*, 515 F.3d 149, 153-54 (2d Cir. 2008) (both holding that the AEDPA statute of limitations remained subject to equitable tolling after *Bowles*); *see also In re Ross-Tousey*, 549 F.3d 1148, 1154-56 (7th Cir. 2008) (analyzing *Bowles* and *John R. Sand & Gravel* and holding that a deadline for motions to dismiss for presumed abuse in the bankruptcy setting was subject to waiver because it is was not a jurisdictional requirement).

In sum, nothing in CERCLA's structure, underlying policies, or legislative history indicate that § 113(g)(2)(A) is a jurisdictional prerequisite to suit in federal court.  Nor does case law interpreting the provision, or similar provisions, lead to that result.  Consistent with the general rule, the Court holds that the time requirement set forth in § 113(g)(2)(A) is a statute of limitations subject to extension by tolling agreements between parties.[31]

---

[30]   The Court also has considered the additional cases cited by NL holding that time limits in statutes other than CERCLA were jurisdictional.  *See TRW, Inc. v. Andrews*, 534 U.S. 19 (2001); *United States v. Brockamp*, 519 U.S. 347 (1997); *see also* NL Mem. at 8-9.  The statutes involved and the facts presented render these decisions wholly inapposite.

[31]   NL also argues that the plain language of § 113(g)(2)'s requirement that an initial cost-recovery action "*must* be commenced . . . within 3 years after completion of the removal" (emphasis added) dictates that the statute is a jurisdictional provision, and that to hold otherwise would render the word "must" surplusage.  *See generally* NL Mem., *passim*; NL Reply., *passim*.  The Court is unpersuaded.  Congressional use of the word "must" does not *per se* remove § 113(g)(2)(A) from the general rule that statutory limitation periods are treated as affirmative defenses subject to forfeiture, waiver, and tolling for equitable considerations.  Moreover, construing § 113(g)(2)(A) as a statute of limitations does not render any of its provisions surplusage.  The word "must" coupled with a time frame establishes a time requirement for filing a cost-
(continued...)

**b.      Tolling Periods Expressed in the Tolling Agreements**

The Court turns to NL's argument concerning the tolling period stated in its agreements with the United States.  It is undisputed that the United States and NL entered into a "Third Tolling Agreement" signed by a NL representative on July 13, 2007.[32]  This agreement specified a tolling period commencing July 22, 2004.[33]  NL argues that the EPA completed the Odessa removal action on June 28, 2001, the date of an EPA press release and event announcing "the completion" of the Odessa site removal action.[34]  The press release announces that the "site cleanup was completed after more than 700,000 pounds of radioactive material was removed and properly

---

[31]      (...continued)
recovery action.  Accordingly, the statutory construction decisions cited by NL that address issues other than the effect of the statutory time limits are not pertinent to the case at bar.  *See Hall Street Associates, L.L.C. v. Mattel, Inc.*, __ U.S. __, 128 S.Ct. 1396 (2008); *see also Burlington Northern & Santa Fe Railway Co. v. United States*, __ U.S. __, 129 S.Ct. 1870 (2009); *United States v. Atlantic Research Corp.*, 551 U.S. 128 (2007)*; Cooper Industries, Inc. v. Aviall Services, Inc*., 543 U.S. 157 (2004).

[32]      *See* NL Mem., at 5; U.S. Resp. to NL, at 7.  The United States has produced copies of four tolling agreements signed by a representative of NL.  Tolling Agreements, Exhs. C, D, E and F. to U.S. Resp. to NL [Doc. # 189-3], at 4.  The first agreement was signed by the NL representative on January 10, 2007.  *See id.*, Exh. C, at 4.  The last agreement was signed on September 14, 2007.  *See id.*, Exh. E, at 4.  NL appears to dispute the number and timing of the tolling agreements it signed.  *See* NL Mem., at 5 ("NL did not sign any "First Tolling Agreement" or any "Second Tolling Agreement."  The "Third Tolling Agreement" was the first time that the United States requested that NL enter into any tolling agreement" (internal citation omitted)).  Because all the agreements produced by the United States state the same tolling period, and were signed more than three years after the completion of the Odessa removal action, it is sufficient for purposes of this motion that the existence and terms of the "Third Tolling Agreement" are undisputed.  *See* Tolling Agreements, Exhs. C, D , E, and F to U.S. Resp. to NL [Doc. # 189-3], at 1, 4.

[33]      Third Tolling Agreement, Ex. E to U.S. Resp. to NL [Doc. # 189-3], at 1, ¶ 2.

[34]      EPA Press Release, Exh. 1 to Decl. of Rebecca E.G. Tankersley [Doc. # 168-3], at 3 of 66.

disposed of by EPA's Superfund program."[35]  NL also cites to a Pollution Report issued by the EPA on July 12, 2001 and submitted into evidence by the United States.[36]  That Report explains:

> All contamination has been removed from the abandoned radioactive material laboratory. The State of Texas Health Department–Bureau of Radiation Control and the EPA's ORIA Lab have surveyed the entire site. The last "fleas" or specks of Americium and Cesium were removed with shovels and trowels.  The future use of the Site is not restricted for any use.[37]

Based on this evidence, NL argues that the removal action was complete at the latest by July 12, 2001, that the limitations period therefore expired at the latest on July 12, 2004,[38] that this action was filed after July 12, 2004, that this action thus was filed after limitations had run, and that it (NL) is therefore entitled to summary judgment.  The Court disagrees.  The United States has submitted uncontroverted evidence that removal activity continued at the Odessa site up to and beyond July 22, 2001, three years prior to the commencement of the tolling period.  In his declaration, Gregory Fife, the EPA's On-Scene Coordinator responsible for the Odessa cleanup, states that at the time of the June 28, 2001, press release and event:

> Radioactive wastes, contaminated soils, and debris removed from the Odessa Site had been consolidated and packaged, but were still being

---

[35]  *Id.*

[36]  *See* July 12, 2001 Pollution Report, Attach. 2 to Fife Decl. [Doc. # 189-2], at 23-24 of 51.  Pollution Reports are contemporaneous updates of the status of a removal action authored by the EPA On-Scene Coordinator.  A report is required for the beginning and completion of a removal action, but the On-Scene Coordinator has discretion to issue additional reports.  *See* Decl. of Gregory Fife, Exh. A to U.S. Resp. to NL [Doc. # 189-2] ("Fife Decl."), at 3, ¶ 8.

[37]  *Id.*

[38]  *See generally* NL Mem., at 7; NL Reply, at 12-15.

held in a secure staging area across the street from the Odessa Site awaiting transport to final disposal sites. In addition, the demobilization of contractor equipment and personnel had not yet occurred.[39]

There is other evidence supporting the United States' position.  In the July 12, 2001 Pollution Report on which NL relies, which was primarily authored by Fife,[40] there is clear evidence that the removal activity continued after July 12, 2001.  That Report states the following under the header "Current Activities":

> The crews are packing and beginning the demobilization. Trailers, equipment, and utilities are being removed.  However, some roll-off boxes remain on Site. The cleanup contractor is at the mercy and schedule of the railroad and disposal companies. They have promised to take delivery at the end of July. The boxes are ready to go, and just need to be put on rail cars for transport to the facilities.[41]

The roll-off boxes contained contaminated soil.[42]

It was not until the Pollution Report of August 13, 2001 that the EPA stated "The Removal Action is complete.  The removal of the last item, 5 sealed sources encased in concrete, completed all activity on the Site."[43]  Fife states that the press event was held to inform the public about the EPA's removal action, and was held on June 28, in part, to allow contractor crews to participate before they demobilized.[44] The October 2001 "Gulf Nuclear Superfund Site Demolition and Removal Action –

---

[39]    Fife Decl., at 4,¶ 11.

[40]    *Id.* at 3, ¶ 9.

[41]    July 12, 2001 Pollution Report, Attach. 2 to Fife Decl. [Doc. # 189-2], at 24 of 51.

[42]    *See* Fife Decl., at 4, ¶ 12. ("As of July 7, 2001, roll-off boxes containing contaminated soils and a drum containing radioactive sealed sources . . . still remained at the Odessa Site.").

[43]    August 13, 2001 Pollution Report, Attach. 3 to Fife Decl. [Doc. # 189-2], at 23-24 of 51.

[44]    Fife Decl,. at 4, ¶ 10.

Closeout Report" ("Closeout Report") prepared by Pangea Group, a contractor for the Army Corps of Engineers, describes a two-stage demobilization process.[45]   The Closeout Report states that the first stage of demobilization continued until August 1, 2001.[46]   The Closeout Report states that the first stage was completed only after the transportation of the final bulk waste shipment off site.[47]   Fife states that final confirmation sampling, site walkovers, and other demobilization activities were ongoing during this first stage.[48]   The second phase of demobilization continued until August 16, 2001, and included the disposition of the final waste shipment.[49]   Fife states that to the best of his knowledge, this final shipment included the five sealed sources referenced in the Pollution Report of August 13, 2001.[50]

CERCLA defines "removal" to encompass a swath of activities including the "the cleanup or removal of released hazardous substances from the environment . . ." 42 U.S.C. § 9602(23).[51]   "Congress intended that the term 'removal action' be given

---

[45]   Closeout Report, Attach. 4 to Fife Decl. [Doc. # 189-2] ("Closeout Report"), at 43-44 of 51; *see also* Fife Decl.*,* at 5, ¶ 15.

[46]   Closeout Report, at 44 of 51; *see also* Fife Decl., at 5, ¶ 15.

[47]   Closeout Report, at 44 of 51; *see also* Fife Decl., at 5, ¶ 15.

[48]   Fife Decl., at 5, ¶ 15.

[49]   Closeout Report, at 44 of 51; *see also* Fife Decl., at 5-6, ¶ 16.

[50]   Fife Decl.*,* at 5-6, ¶ 16.

[51]   The complete definition provides:

> The terms "remove" or "removal" means the cleanup or removal of released hazardous substances from the environment, such actions as may be necessary taken in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or

(continued...)

a broad interpretation." *Geraghty and Miller, Inc. v. Conoco Inc.*, 234 F.3d 917, 926 (5th Cir. 2000) (quoting *Kelley v. E.I. DuPont de Nemours and Co.*, 17 F.3d 836, 843 (6th Cir. 1994)); *see also United States v. Cantrell*, 92 F. Supp. 2d 704, 716 (S.D. Ohio 2000) (finding that final site inspection was part of removal action).  Section 113(g)(2)(A)'s statute of limitations does not begin to run until all site activities conducted as part of the removal action are complete.  *See United States v. R.A. Corbett Transp., Inc.*, 785 F. Supp. 81, 82 (E.D. Tex. 1990).

When viewed in the light most favorable to the nonmovant, here, the United States, the record shows that the EPA's Odessa site removal activities continued past July 22, 2001.  In the face of this significant evidence, the June 27, 2001 EPA press release is entitled to minimal weight and does not constitute evidence sufficient to entitle NL to judgment as a matter of law.  *See United States v. Am. Premier Underwriters, Inc.*, October 5, 2009, slip op. at 14 (D. Mass. Dec. 11, 2008) (rejecting a limitations argument based on an EPA press release)**.**  The United States has raised a genuine issue of material fact as to whether the Odessa site removal action continued past July 22, 2001.

**c.      Tolling  Agreements  Signed  After Expiration of Limitations Period.**

---

[51]        (...continued)

the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release. The term includes, in addition, without being limited to, security fencing or other measures to limit access, provision of alternative water supplies, temporary evacuation and housing of threatened individuals not otherwise provided for, action taken under section 9604(b) of this title, and any emergency assistance which may be provided under the Disaster Relief and Emergency Assistance Act, 42 U.S.C.A. § 5121 et seq..

NL also contends that because it did not sign any tolling agreements with the United States until well after the § 113(g)(2) limitations period had expired, the agreements are invalid for lack of consideration.[52]

NL's argument is without merit.  A statute of limitations defense may be waived "before or after the expiration of the prescribed time limit."  *Titus v. Wells Fargo Bank and Union Trust Co.*, 134 F.2d 223, 224 (5th Cir. 1943); *Starcrest Trust v. Berry*, 926 S.W.2d 343, 351 (Tex.App.–Austin 1996).  Each tolling agreement recites that it was made "in consideration of the covenants set out herein, the sufficiency of which is hereby acknowledged."[53]  More significantly, the United States argues persuasively that consideration for the tolling agreement existed in the opportunity to forestall litigation and facilitate settlement negotiations regarding not just the Odessa site that is the subject of the instant motion, but for the other Gulf Nuclear Sites for which NL is also a PRP.  Further, CERCLA provides protection against contribution actions from other PRPs to persons who resolve their liability to the United States.  *See* 42 U.S.C. § 9613(f)(2).  Since NL was subject to potential contribution claims for the Gulf Nuclear Sites, this opportunity for global protection constituted consideration for the tolling agreements.[54]  The Court holds as a matter of law that any tolling agreements entered into by NL and the United States are not invalid because they were signed after the expiration of the relevant limitations period.

### d.    The Texas CERCLA Claims Against NL

---

[52]    *See* NL Mem., at 15.

[53]    Tolling Agreements, Exhs. C, D, E, and F to U.S. Resp. to NL [Doc. # 189-3], at 1.

[54]    The United States also argues in the alternative that statutes of limitations may be waived without consideration.  U.S. Opp'n at 12 (citing *Collins v. Woodworth*, 109 F.2d 628, 629-30 (6th Cir. 1940) ( statutes of limitation "may be waived without consideration, by express contract or by necessary implication." ).  The Court does not decide this issue.

NL moves for summary judgment against Texas' CERCLA claims on the same grounds as against the United States.[55]  Texas responds simply by incorporating the "statements, arguments and authorities presented by the United States in its response" to NL's motion.[56]  Although NL provides no detailed argument on this issue, instead focusing its arguments against the United States, NL does refer to the Texas claims in a representative's statement that NL "did not sign any tolling agreement with the State of Texas."[57]

Texas does not dispute that the Odessa site removal action was completed at some point in 2001, and that the State filed its Complaint-in-Intervention in November, 2007.  The State's adoption of the United States' arguments against NL's motion is ineffective.  The tolling agreements between NL and the United States make no reference to Texas' CERCLA claims.[58]  There is no evidence cited in the record

---

[55]   NL Mot. for Summ. J., at 1 ("Defendant NL . . . moves for partial summary judgment . . . on the grounds that the claims of the United States of America and the State of Texas with regard to the Gulf Nuclear Odessa Site are barred as a result of their failure to comply with the statutory condition set forth in Section 113(g)(2) of [CERCLA]." *See also* NL Mem., at 17; NL Reply, at 19 (both stating: "Based on the foregoing, NL respectfully requests that the Court dismiss Plaintiffs' claims with regard to the Odessa Site with prejudice. . . ."); NL Reply, at 1(arguing that nothing said by the United States or Texas changes the fact that both are time-barred under CERCLA § 113(g)(2)).

[56]   *See* Texas Resp. to NL, at 3.  Texas also purports to incorporate the arguments and authorities raised by the United States in its response to QSA Global's limitations motion.  As discussed in Part III(A)(1), *supra*, the United States relied on an equitable tolling argument in opposing QSA Global's motion.  The United States has not raised the doctrine of equitable tolling in response to NL's motion, however.  Texas has produced neither evidence nor argument as to why it is entitled to equitable tolling of the CERCLA statute of limitations against NL.  To the extent that Texas maintains an equitable tolling argument against NL, it is rejected.

[57]   Decl. of Rebecca Tankersly [Doc. # 168-3], at 2 of 66, ¶ 6.

[58]   *See generally* Tolling Agreements, Exhs. C, D, E, and F to U.S. Resp. to NL [Doc. # 189-3], at 1 ("The United States and each of the PRPs enter into this Tolling (continued...)

that Texas entered into a tolling agreement with NL.  The United States/NL tolling agreements, by their terms, do not apply to Texas' claims; the agreements provide that "each PRP reserves the right to assert all rights, claims, or defenses available to such PRP and this Tolling Agreement does not alter the rights, claims, and defenses of any PRPs except as expressly provided for the contrary herein . . . *this Tolling Agreement is not intended to affect any Parties' claims or rights by or against third parties.*"[59] The Court accordingly holds that Texas' CERCLA claims against NL with regard to the Odessa site are time-barred under the three-year limitations period in § 113(g)(2)(A).

### 2.    The Texas TSWDA Claim Against NL

NL argues that the one-year limitation under Texas Health and Safety Code § 361.197(a) ("§ 197(a)") governs Plaintiff Texas' cost-recovery action.  NL deduces that the State's claims are time-barred because the instant suit was filed more than six years after the Odessa removal action was complete.[60]  Section 197(a) provides:

> (a)    The commission shall file a cost recovery action against all responsible parties who have not complied with the terms of an administrative order issued under Section 361.188.[61] The commission

---

[58]    (...continued)
Agreement  . . . .).

[59]    *Id.* at 2, ¶ 8 (emphasis supplied).

[60]    *See* NL Mem., at 16; NL Reply, at 15-19.

[61]    Section 361.188 provides that "[a]fter consideration of all good faith offers to perform a remedial action, the commission shall issue a final administrative order."  TEX. HEALTH & SAFETY CODE § 361.188(a).  A final administrative order must:

> (1)    list the facility on the state registry, thus determining that the facility poses an imminent and substantial endangerment to public health and safety or the environment;

(continued...)

shall file the cost recovery action no later than one year after all remedial action has been completed.

TEX. HEALTH & SAFETY CODE § 361.197(a).   NL contends that since the State predicates its cost-recovery rights on § 361.197, this one-year limitation period applies.

The Court is unpersuaded.  Section § 197(a) applies only to cost-recovery actions arising from non-compliance with an administrative order and no such administrative order was issued, or needed to be issued, against NL as to the Odessa

---

[61]      (...continued)

     (2)    specify the appropriate land use for purposes of selecting the appropriate remedial action;

     (3)    specify the selected remedial action;

     (4)    list the parties determined to be responsible for remediating the facility;

     (5)    make findings of fact describing actions voluntarily undertaken by responsible parties;

     (6)    order the responsible parties to remediate the facility and, if appropriate, reimburse the hazardous waste disposal fee fund for remedial investigation/feasibility study and remediation costs;

     (7)    establish a schedule for completion of the remedial action;

     (8)    state any determination of divisibility of responsible party liability; and

     (9)    give notice of the duties and restrictions imposed by Section 361.190.

*Id.*

site.[62]  The case at bar does not arise from an administrative order.  The State sued NL under § 361.197(d) ("§ 197(d)"), which provides for cost-recovery actions for expenditures out of the Hazardous and Solid Waste Remediation Fee Account (established under § 361.133).  In contrast to § 197(a), § 197(d) contains no statute of limitations.[63]  Subsections 197(a) and (d) were enacted in different bills in different sessions of the legislature.  The Legislature enacted the one-year limitations period in § 197(a) in 1989 as part of new formal state Superfund program.[64]  Section § 197(d)'s cause of action, on the other hand, was enacted in 1997 as part of a bill expanding and making changes pertaining to the Hazardous and Solid Waste Remediation Fee Account established under § 361.133.[65]

The phrasing of § 197(a), moreover, suggests that the limitations period does not apply.  Section 197(a) contains two sentences.  The second sentence refers to "*the* cost recovery action," and is limited by the first sentence, which refers to "a cost recovery action" that is to be filed when there is a violation of an administrative order.  Further, the cause of action set forth in § 197(a) involves administrative orders subject to the detailed requirements of § 361.188.  Those requirements do not govern other

---

[62]  Texas Resp. to NL, at 4-9.

[63]  Section 361.197(d) provides:  "The commission shall file a cost recovery action against each responsible party for the total costs of an action taken under Section 361.133(c)(1), (2), (3), (5), or (6) or Section 361.133(g)."

[64]  *See* SOLID WASTE DISPOSAL ACT, 71st Leg., R.S., ch. 703, § 5, sec. 13, 1989 TEX. GEN. LAWS 3212, 3218-32.  For the cost-recovery cause of action, and the one-year limitation, see *id.* sec. 13(m), 1989 TEX. GEN. LAWS at 3226 (current version codified as TEX. HEALTH & SAFETY CODE § 361.197(a)).

[65]  Act of May 22, 1997, 75th Leg., R.S., ch. 793, § 1, sec. 361.133, 1997 TEX. GEN. LAWS 2595 (current version at TEX. HEALTH & SAFETY CODE § 361.133(g)).  For the cost-recovery cause of action, *see id.* § 9, sec. 361.197(d), 1997 TEX. GEN. LAWS at 2598 (current version codified at TEX. HEALTH & SAFETY CODE § 361.197(d)).

claims, such as those provided for in § 197(d), the statute on which the State relies in this case.  The legislative history, as well as the structure of § 197(a) and (d) demonstrate that the one-year § 197(a) limitations period is not to be read into § 197(d).  NL's argument that the § 197(a) one-year limitations period applies to Texas' cost-recovery action here is rejected.[66]

## III.   CONCLUSION AND ORDER

For the forgoing reasons, Defendant QSA Global's Motion for Summary Judgment is granted as to the CERCLA claims of Plaintiffs United States and Texas, but denied as to the Texas TSWDA claim.  The United States Cross-Motion for Summary Judgment Against QSA Global is denied.  The Texas Cross-Motion against QSA Global is denied as to the CERCLA claims but granted as to the TSWDA claim. NL's Motion for Summary Judgment is granted as to the Texas CERCLA claim, but denied as to the United States CERCLA claim and the Texas TSWDA claim. Accordingly, it is hereby

**ORDERED** that QSA Global's Motion for Summary Judgment [Doc. # 129] is **GRANTED IN PART** and **DENIED IN PART**.  It is further **ORDERED** that The United States Cross-Motion for Summary Judgment [Doc. # 149] is **DENIED.**  It is further **ORDERED** that the Texas Cross-Motion for Summary Judgment [Doc. # 152] is **GRANTED IN PART** and **DENIED IN PART**.  It is further **ORDERED** that the

---

[66]   NL purports generally to adopt QSA Global's arguments to the extent that the Court finds that the one-year limitation period does not apply.  *See* NL Mem., at 1.  As discussed *supra*, QSA Global originally asserted that a residual four-year limitations period applied to the State's claim before apparently abandoning that argument and raising the doctrine of laches.  NL has produced neither evidence nor argument as to why it is entitled to rely on laches.  To the extent that NL maintains that either laches or the residual four year statute of limitations applies to bar the State's claim under § 361.197(d), that contention is rejected.  *See* Part III(A)(2) *supra*.

NL Motion for Summary Judgment [Doc. # 168]  is  **GRANTED IN PART** and **DENIED IN PART.**

SIGNED at Houston, Texas, this 9th day of **October, 2009**.

Nancy F. Atlas
United States District Judge